## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**DR. MELVIN SMITH,**

         Plaintiff,                       Case No. 23-cv-10872

v.                                        Hon.

**REGENTS OF THE**
**UNIVERSITY OF MICHIGAN - FLINT**;

         Defendants.

_____/

| | |
|---|---|
| **I.A.B. ATTORNEYS AT LAW, PLLC .** | **BUTZEL LONG** |
| By :   **Felicia Duncan Brock (P63352)** | By:   **Daniel B. Tukel (P34978)** |
| 8829 Asbury Park | 201 West Big Beaver Road |
| Detroit, Michigan  48228 | Suite 1200 |
| (313) 318-3180 | Troy, Michigan  48084 |
| **Attorneys for Plaintiff** | (248) 258-1616 |
| | **Attorneys for Defendants** |
| **SMITHWEBSTER LAW OFFICES, PLLC** | |
| By:   **Tracy G. Smith (P74572)** | |
| 28488 Woodward Avenue, #427 | |
| Royal Oak, Michigan  48073 | |
| (313) 949-5414 | |
| **Attorneys for Plaintiff** | |

_____/

## <u>DEFENDANTS' NOTICE OF REMOVAL</u>

For its Notice of Removal pursuant to 28 U.S.C. §§ 1331, 1441, and 1446,
defendants Regents of the University of Michigan (incorrectly named as "Regents
of the University of Michigan – Flint" and hereafter "defendant" or "the
University") state as follows:

    1.     Plaintiff commenced this action as Case No. 23-118665-CD, in

the Genesee County Circuit Court, State of Michigan, on March 16, 2023.

2.     Plaintiff's original Complaint was served on defendant University of Michigan by certified mail on March 21, 2023.   The original Complaint and summons are attached as Exhibit A.

3.     No other pleadings have been filed with the Genesee County Circuit Court.  (*See* Exhibit B, Genesee County Circuit Court Docket Sheet).

4.     This removal is timely under 28 U.S.C. § 1446(b) because this Notice of Removal is being filed within thirty days of receipt by defendant of the Complaint.

5.     Pursuant to 28 U.S.C. § 1441(a), the United States District Court for the Eastern District of Michigan is the federal district court embracing the place (*i.e.,* Genesee County Circuit Court) where the state court suit is pending.

6.     This Notice is filed pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, which provide for the removal of any civil action in which the United States District Court has original jurisdiction.

7.     This matter should be removed because it could have been filed originally in this Court pursuant to 28 U.S.C. § 1331, as this Court has federal question jurisdiction over plaintiff's claims against defendant University in Counts IV, V and VI, each of which allege a violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq.

8.     Plaintiff's claims in Counts IV, V and VI, alleging violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. are "founded on a claim or right arising under the Constitution, treaties or laws of the United States" and are properly removed to this Court.  28 U.S.C. § 1441(b).

9.     Counts I, II and III allege essentially identical claims under the Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.   This Court can exercise supplemental jurisdiction over those state law claims under 28 U.S.C. § 1367 because the claims are so closely related to the Title VII claims in Counts IV, V and VI that the state law claims form part of the same case or controversy.

10.    All of plaintiff's claims in the Complaint against the defendant arise out of a common nucleus of operative facts and, specifically, the same factual circumstances.  Plaintiff thus would ordinarily be expected to try them all in one proceeding.  *See, e.g., United Mine Workers v. Gibbs,* 383 U.S. 715, 717 (1966); *Salei v. Boardwalk Regency Corp.,* 913 F. Supp. 993 (E.D. Mich. 1996).

11.    Defendant is serving written notice of the filing of this Notice of Removal upon plaintiff and will cause a copy of this Notice to be filed with the Clerk of the Genesee County Circuit Court, State of Michigan, in accordance with 28 U.S.C. § 1446(d).  (*See* Exhibit C, Notice to State Court).

WHEREFORE, defendant requests that the above-entitled action be removed from the Genesee County Circuit Court to the United States District Court for the Eastern District of Michigan.

**BUTZEL LONG**

By: */s/ Daniel B. Tukel*
Daniel B. Tukel
201 West Big Beaver Road
Suite 1200
Troy, Michigan  48084
(248) 258-1616
tukel@butzel.com
(P34978)

DATED:     April 17, 2023

## <u>Certificate of Service</u>

I hereby certify that on April 17, 2023, I electronically filed the foregoing document, Defendants' Notice of Removal, with the Clerk of the Court using the ECF system, and sent copies via U.S. Mail to:

Felicia Duncan Brock
8829 Asbury Park
Detroit, Michigan  48228

Tracy G. Smith
28488 Woodward Avenue, #427
Royal Oak, Michigan  48073

s/ Daniel B. Tukel
201 West Big Beaver Road
Suite 1200
Troy, Michigan  48084
(248) 258-1616
tukel@butzel.com
(P34978)

# EXHIBIT A

Original - Court
1st copy - Defendant

GARRETT CHRISTENSON
P-61009

2nd copy - Plaintiff
3rd copy - Return

Approved, SCAO

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| **JUDICIAL DISTRICT** | **SUMMONS** | |
| 7th  **JUDICIAL CIRCUIT** | | 23 – 118665 – CD |
| **COUNTY PROBATE** | | |

**Court address**
900 S. Saginaw Street, 2nd Floor, Flint, Michigan 48502

**Court telephone no.**
(810) 424-4355

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| Dr. Melvin Smith | v | Regents of the University of Michigan--Flint c/o Santa J. Ono, President 3190 Ruthven Building 1109 Geddes Avenue Ann Arbor, Michigan 48109-1079 (734) 764-6270 |

RECEIVED

MAR 2 1 2023

UNIVERSITY OF MICHIGAN

| Plaintiff's attorney, bar no., address, and telephone no. |
|---|
| Felicia Duncan Brock (P63352) I.A.B. Attorneys At Law, PLLC 8829 Asbury Park Detroit, Michigan 48228 (313) 318-3180 |

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____.

The action ☐ remains ☐ is no longer  pending.

Summons section completed by court clerk.     **SUMMONS**

**NOTICE TO THE DEFENDANT**: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| 3 | 16 | 23 | 6 | 15 | 23 | Ashley Lovett |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01  (9/19)  **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

**SUMMONS**

Case No. 23-118615-CD

**PROOF OF SERVICE**

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

B. CHRIS CHRISTENSON
P-61009

**CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE**

| ☒ OFFICER CERTIFICATE | OR | ☐ AFFIDAVIT OF PROCESS SERVER |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,

☒ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _Jury Demand_
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name Regents of the University of Michigan - Flint C/o Santa J. Ono, President; | Complete address(es) of service: 3109 Ruthven Building 1109 Geddes Avenue Ann Arbor, Michigan 48109-1079 | Day, date, time Thurs. 03/16/23 @ 1:00 pm |
|---|---|---|
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled | Fee $ | | Signature _Tracy G. Smith_ |
|---|---|---|---|---|
| Incorrect address fee $ | Miles traveled | Fee $ | TOTAL FEE $ | Name (type or print) _Attorney_ Title |

Subscribed and sworn to before me on _____, _____ County, Michigan.
Date

My commission expires: _____ Signature: _____
Date                                        Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of the summons and complaint, together with _____
Attachments

_____ on _____
Day, date, time

_____ on behalf of _____
Signature

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF GENESEE

DR. MELVIN SMITH

           Plaintiff,

vs.

REGENTS OF THE UNIVERSITY
  OF MICHIGAN—FLINT

           Defendant.

Hon.

Case No: 2023- 118665 -CD

**B. CHRIS CHRISTENSON
P-61009**

_____/

FELICIA DUNCAN BROCK (P63352)
I.A.B. Attorneys At Law, PLLC
*Attorneys for Plaintiff*
8829 Asbury Park
Detroit, Michigan 48228
(313) 318-3180
duncan@iabattorneys.com

TRACY G. SMITH (P74572)
SmithWebster Law Offices, PLLC
*Attorney for Plaintiff*
28488 Woodward Avenue, #427
Royal Oak, Michigan 48073
(313) 949-5414
TSmith@SmithWebster1.com



_____/

There is no other pending or resolved civil action
arising out of the transaction or occurrence alleged
in the Complaint.

## COMPLAINT AND JURY DEMAND

Plaintiff, DR. MELVIN SMITH, by his attorneys I.A.B. Attorneys At Law, PLLC and

SmithWebster Law Offices, PLLC, and per his Complaint, states as follows:

1

1.      This is an action to enforce civil and common-law rights arising out of Dr. Smith's employment relationship with the University of Michigan—Flint, pursuant to the Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq. and Title VII of the Civil Rights Act of 1964 as amended, 42 USC §200e-16.

2.      Plaintiff DR. MELVIN SMITH is a resident of the County of Macomb, State of Michigan.

3.      Defendants REGENTS OF THE UNIVERSITY OF MICHIGAN—FLINT are the regents from a state governed, public educational institution located within the County of Genesee, State of Michigan.

4.      At all relevant times, Defendants are an employer within the meaning of the Michigan Elliott Larsen Civil Rights Act and Title VII of the Civil Rights Act of 1964.

5.      The events giving rise to this cause of action occurred in Genesee County.

6.      At all times relevant to the claim embodied in this Complaint, all agents of Defendants were acting under Defendants' authority.

7.      The amount in controversy exceeds $25,000, exclusive of interest, costs and attorney fees.

## A.      BACKGROUND

8.      Dr. Smith is an African-American man.

9.      Dr. Smith has the following credentials:

    a.  DPT—Clinical Doctorate Physical Therapy—University of Michigan—Flint, December 2008;
    b.  BS—Health Science—University of Michigan—Flint, 2006;
    c.  BS—Movement Science—Grand Valley State University—April 2003;
    d.  LPN—Licensed Practical Nurse—2021

2

10.     From May 2015 to Present, Dr. Smith teaches both lectures and labs at Wayne County Community College District.  Specifically, Dr. Smith teaches Anatomy, Physiology I and II, and Introductory Biology.

11.     In or about August 2019, Defendant hired Dr. Smith as a Leo Lecturer I.  Since being hired, Dr. Smith has taught each Fall semester and one Winter semester.  Specifically, he has taught:

   a.  Bio 634—Human Gross Neuro Anatomy (Cadaver Lab)—Doctor of Occupational Therapy ("OT") students;
   b.  Bio 510—Human Anatomy—Physician Assistant Graduate students only;
   c.  Bio 104—Introduction to Human Biology—Dual Enrollment students (high school students) on campus.

12.     Dr. Smith was notified that in Fall 2023, he will be teaching the OT lab for Bio 634. Since Fall of 2019, Dr. Smith has only taught Defendants' labs, no lectures.

13.     Bio 634 requires the use of the cadaver lab.

14.     Throughout his employment with Defendant, Dr. Smith received better than average, on a 5-point Likert scale, student course evaluations.   On a five-point scale, Dr. Smith received the following mean scores:  Fall 2019—4.8; Fall 2020—4.3, and 4.4; Winter 2021—4.1 (Course Workload 2.9); Fall 2021—3.7 and Fall 2022—4.8.

15.     Noteworthy, in the Winter 2021 Semester, Dr. Smith taught Bio 510—M1 LAB and Bio 510—M2 Lab, alongside Dr. Jon Morey ("Morey").

16.     Morey, a white male, has a Doctor of Chiropractic degree; and is a Leo Lecturer II in Defendants' Department of Natural Sciences.  Morey teaches both lectures and labs.

17.     Also, Morey is a 5th degree black belt (Master Status) in the martial art of Hapkido.

### B.      FALL 2019

18.     In Fall 2019, Dr. Smith taught the lab for Bio 634, a course for students in doctoral programs.

19.     Also sharing the same cadaver lab were Dr. Smith's three co-workers.  Morey, Dr. Kerry Lazenby ("Lazenby"), a white male; and Earl Mayhew ("Mayhew"), a white male.

20.     Lazenby is also a Leo Lecturer I with a Doctorate Degree from the Logan College of Chiropractic.  Lazenby primarily teaches lab.

21.     Mayhew is a Leo Lecturer II with a Master of Physical Therapy degree.  He does not have a doctorate degree.  Mayhew teaches lectures and labs.

22.     "The Lecturer I/II typically teaches both Fall and Winter semesters on a regular basis."[1]

***Morey Disrupting the Cadaver Lab during Dr. Smith's Instructional Time/Dr. Smith was targeted.***

23.     On September 3, 2019, days after the beginning of Dr. Smith's first teaching semester at Defendants', Morey entered the cadaver lab during Dr. Smith's instructional time.

24.     Morey looked around the lab, took bones out of the cabinets, put them on the lab tables, stared at Dr. Smith and left.

25.     Students were present when Morey entered the lab; and Dr. Smith's instructional time was interrupted.

26.     On September 5, 2019, Morey entered the cadaver lab during Dr. Smith's instructional time.

27.     This time, Morey asked Dr. Smith whether he was finished for the day.  Students were present when Morey entered the lab.

---

[1] Taken from the University of Michigan's Summary of Lecturer Appointments, https://adaa.engin.umich.edu/chairs/lecturer/, dated February 22, 2023.

28.   Dr. Smith then asked Morey to please not disturb his class; and not to enter the lab until his class is over.

29.   On October 28, 2019, Morey entered the cadaver lab during Dr. Smith's instructional time.

30.   This time, Morey asked Dr. Smith how he was disposing of cadaver waste.  Dr. Smith explained how he was disposing of the waste; and that he received the waste disposal instructions from the Department of Natural Sciences and Mayhew.

31.   Also on October 28, 2019, Morey filed a complaint regarding violations of safety protocols in the cadaver lab.

32.   In November 2019, Dr. Smith received an email from Dr. Randall Duncan ("Duncan"), Professor and then Chair of the Department of Biology, directed to lab faculty stating that safety violations in the cadaver lab would not be tolerated.

33.   On December 5, 2019, Larry Atherton, Biology Laboratories Supervisor, entered the cadaver lab during Dr. Smith's instructional time and looked around.

## C.   FALL 2020

34.   When Dr. Smith returned for the Fall 2020 semester, COVID safety protocols were instituted.

35.   On September 3, 2020, days into the semester, Dr. Karmen Hollis-Etter ("Etter"), an Associate Professor of Biology in the Department of Natural Sciences, sent Dr. Smith a text stating, "Make sure u r following protocols, social distancing and fill out the log if needed.  We do not wnat [sic] to get shut down for not following the rules."

36.     On September 10, 2020, Mayhew informed Etter that Morey has been attempting to get Dr. Smith terminated; and has been informing others that Dr. Smith has not been following the COVID social distancing and other policies.

37.     Dr. Smith followed <u>all</u> of Defendants' COVID social distancing and/or other policies.

38.     In fact, it was Morey that violated the COVID social distancing policy; and the policy requiring face masks be worn when in the lab with students.

39.     On September 16, 2020, Etter sent Dr. Smith a text saying, "Talked to Earl today. I am sorry I texted and bothered you about the lab. I am also sorry things are tense. Glad you talked to Randy [Duncan]."

***Morey Disrupting the Cadaver Lab during Dr. Smith's Instructional Time***

40.     On September 3, 2020, Morey entered the cadaver lab during Dr. Smith's instructional time; and asked him whether he was finished with his class.

41.     Dr. Smith was being rushed out of the cadaver lab.

42.     Mayhew scheduled a meeting with Duncan, along with Dr. Smith, and Lazenby to discuss Morey's treatment of Dr. Smith, among other things.

43.     On or about September 12, 2020, Dr. Smith, Mayhew and Lazenby met with Duncan. During this meeting, Dr. Smith informed Duncan that Morey repeatedly was entering the cadaver lab during his instructional time; and that his doing so was interrupting the class and interfering with Dr. Smith's teaching.

44.     In this same meeting, Dr. Smith informed Duncan that Morey had a history of targeting minorities; and that he was doing so with him—the only non-white Leo Lecturer utilizing the cadaver lab.

45.   Notably, Lazenby and Mayhew never made targeting complaints or any other race-based complaints.

46.   On September 17, 2020, Duncan stated, "I won't stand for anyone being targeted in this situation."

47.   According to Duncan, "it is a faux pas to walk into another instructor's class without permission while they are teaching."[2] He then stated that he told Morey "not to enter the lab while [Dr. Smith] was teaching."

48.   On September 29, 2020, Dr. Smith reported to Duncan that Morey again entered the cadaver lab during his instructional time. This time, Morey went into cabinets, took out items and put them on the tables, among other things.

49.   On this same date, Dr. Smith noticed Morey was lingering outside of the cadaver lab door listening as Dr. Smith taught his class.

50.   Dr. Smith's cadaver lab instructional times were posted on the outside of the cadaver lab doors; and is/was hours before Morey's lab time.

51.   Dr. Smith also informed Duncan, again, that he—the minority—was the only person Morey was treating in this manner.

52.   On September 30, 2020, Duncan once again stated that he would talk with Morey about entering the cadaver lab during Dr. Smith's instructional time.

53.   On October 22, 2020, Dr. Smith notified Duncan that Morey continues to enter the cadaver lab during his instructional time; rushes him to leave the lab—asking whether he is done with class.

---

[2] Unless indicated otherwise, all "according to" factual assertions are taken from Defendants' December 12, 2022, Preliminary Investigative Report.

54. Dr. Smith also informed Duncan, once again, that Morey is lingering outside of the cadaver lab doors during Dr. Smith's instructional time.

55. On October 23, 2020, Duncan replied that he would address Morey regarding entering the cadaver lab during Dr. Smith's instructional time.

### D. WINTER 2021

#### i. *Co-Teaching Bio 510 with Morey*

56. Due to COVID restrictions, the number of students allowed in the cadaver lab at one time was decreased. This decrease necessitated that the students be split into two lab sections.

57. On January 29, 2021, Duncan contacted Dr. Smith and asked whether he would be willing to co-teach a course with Morey.

58. Up until this time, Dr. Smith had contacted Duncan on multiple occasions asking for increased responsibilities. On October 22, 2019, Dr. Smith sent one such email stating, "I am interested in teaching Anatomy & Physiology 1 and 2 (Lecture and labs) and would love the opportunity if a spot becomes available in the near future."

59. Dr. Smith accepted the appointment. Dr. Smith's Appointment Letter for Winter 2021 states "You are scheduled for the following courses: BIO 510-M1 LAB (co-taught); BIO 510-M2 LAB (co-taught)".

60. Later, on February 2, 2021, Dr. Smith informed Duncan that his goal was to become full time faculty.

61. During the co-teaching appointment, Dr. Smith noted that Morey was preventing him from performing his job duties. For example, Dr. Smith was prevented from checking papers, grading, setting up lab exams, and the like.

62.   In fact, at least two students believed that Dr. Smith was merely to watch over the lab, not to teach.

63.   According to second year Physician Assistant ("PA") student Zehra Alghazaly, "she met [Morey] when he taught the PA students' winter 2021 anatomy class. She met [Dr. Smith] that same semester, in the lab, as the PA students were told that [Dr. Smith] was there as a "'second hand,'" as the class was split up due to COVID capacity restrictions."

64.   Alghazaly continued, "it was her understanding that [Dr. Smith] was only involved to supervise students in rooms where [Morey] was not present, and was affiliated with the course to assist [Morey], not to teach."

65.   According to another student Sachin Sohal, Morey's lab assistant who was "briefly" enrolled in the course in Winter 2021; "he later came to understand that [Dr. Smith's] 'only function was to oversee us students, so as to appease any/all COVID-19/University protocols,'" and that [Dr. Smith] was not meant to co-teach but rather to "'babysit'" the class."

66.   In March 2021, Dr. Smith discussed with Morey that he is co-teaching the course and should be included in everything related to the class.

67.   Dr. Smith also contacted Duncan and informed him of Morey's treatment. Duncan stated that he would address the situation with Morey.

68.   According to Duncan, "[Dr. Smith] was paid and expected to co-teach, not merely function as [Morey's] assistant."

69.   After Dr. Smith informed Duncan that Morey was not treating him as an equal, Duncan "then had a conversation with [Morey] about those concerns. . . . "[Duncan] said he is

confident that he communicated to [Morey] that [Dr. Smith] was serving as a co-instructor."

70.   April 2021, Dr. Smith followed up with Duncan regarding Morey preventing him from performing his co-teaching job duties.  Duncan indicated that he had been busy; and that he would take care of it.

71.   Morey continued to prevent Dr. Smith from performing his co-teaching duties throughout the entire Winter 2021 semester; both before and after Dr. Smith informed Duncan of Morey's treatment.

*ii.*   ***Morey Disrupting the Cadaver Lab during Dr. Smith's Instructional Time/ Questioning Dr. Smith's Credentials***

72.   Also in April 2021, Morey entered the cadaver lab, approached Dr. Smith and asked what colleges he attended.  Morey expressed that he did not believe Dr. Smith had a doctorate degree; and asked four times what schools Dr. Smith attended.

73.   Dr. Smith repeatedly responded that this was not Morey's business, and that Defendants had his credentials on file.

74.   According to Morey, he "spoke to a senior faculty member in biology [Morey declined to name her] and asked her what he should do if he suspected that a lecturer did not have appropriate credentials to teach.  He said she told him that it was unlikely that a lecturer would not have an appropriate degree before hiring."

75.   Also according to Morey, he "then approached Fhaner" who directed him to HR. "[Morey] then raised his concerns with HR."

76.   In May, 2021, Dr. Smith contacted Matthew Fhaner ("Fhaner"), Associate Professor and new Chair of the Department of Natural Sciences to introduce himself; and offered to

volunteer for any appointments or anything the department may need.  Dr. Smith also expressed that he wanted to be included in the future.

77.    Fhaner responded that he did not have anything available at the time.

### E.    FALL 2021

78.    On September 21, 2021, Dr. Morey consulted with Dr. Asima Hassan regarding difficulties he was having sleeping; and sleep deprivation from the on-the-job treatment he suffered from Morey.

79.    On November 2, 2021, Monique Wilhelm requested, for the first time, that Dr. Smith, Mayhew, Lazenby and Morey send their credentials/degree information to her to review and pass on to Wayne State University.

80.    According to Lazenby, before this time, he was never asked to provide verification of his educational background/credentials.

81.    And, Morey "never questioned his credentials. . . . He believes he provided verification when he was first hired but he has not had to verify his credentials since then."

82.    Similarly, Mayhew, who does not hold a doctorate degree, said "[Morey] has never questioned [his] academic credentials."

83.    In addition, according to Morey, "he has not been asked to verify his own degrees or credentials."

84.    Moreover, although HR "communicated they are satisfied with [Dr. Smith's] answers", Morey "said he continues to have questions about [Dr. Smith's] qualifications."

*i.*    ***Morey Disrupting the Cadaver Lab during Dr. Smith's Instructional Time/Dr. Smith's Final Examinations***

85.    On December 8, 2021, Final Exam Day, Morey entered the cadaver lab while Dr. Smith's students were taking their final examinations.  Morey entered, went to the cabinets,

loudly pulled out items, and asked Dr. Smith whether his class was done so that Dr. Smith would leave the lab.

86. Dr. Smith's class was still in session. The students complained to Dr. Smith and asked who Morey was.

87. In less than 30 minutes, Morey re-entered the cadaver lab. At this time, the students were turning in their final examinations and were leaving; however, class was still in session.

88. This time, Morey again questioned Dr. Smith's credentials and educational background— in front of students.

89. On December 10, 2021, Dr Smith contacted Fhaner. He explained what was occurring in the cadaver lab; and the fact that Morey has a history of targeting minorities, and that he targeted Dr. Smith from 2019 – present.

90. Fahner said he would look into the matter.

91. According to Lazenby, Dr. Smith would be "'distraught and upset'" after Morey would walk into his room while he was teaching; and that Morey was "'continuously interrupt-ing]'" his class sessions.

92. Lazenby further stated that "[Dr. Smith] shared that [Morey's] conduct toward him has impacted his ability to do his job."

### F.     WINTER 2022

***Partially Meets Expectations Interim Review***

93. In January 2022, Dr. Smith met with Fhaner to once again explain the series of events that occurred with Morey from 2019 to present.

94.    Present for this meeting were Dr. Smith, Fhaner, Beth Manning ("Manning")—Human Resource Director, and Stevens Wandmacher ("Wandmacher")—University of Michigan Lecturers' Employee Organization's Flint Campus Grievance Officer.

95.    On January 28, 2022, after the above-mentioned meeting, Fhaner issued Dr. Smith an interim review with a rating of partially meets expectations.

96.    Pursuant to the Lecturers' Employee Organization Collective Bargaining Agreement, Article XIX(A)(8), "In any review, student evaluations shall not be the sole measure of teaching performance. A small amount of negative student evaluations shall not in and of itself constitute grounds for an unsuccessful review."

97.    On February 2, 2022, Dr. Smith treated with Dr. Ryan Gleesing who prescribed him Trazadone for sleeping difficulties; and sleep deprivation from the on-the-job treatment he suffered.

98.    On March 22, 2022, Dr. Smith followed-up with Manning regarding Morey and any next steps that would occur. Manning informed Dr. Smith that the matter would be addressed and that Morey would be precluded from entering the cadaver lab during his instructional time.

### G.    FALL 2022

*i.*    ***Morey Disrupting the Cadaver Lab during Dr. Smith's Instructional Time/Morey Makes Racially Derogatory Statements***

99.    On August 30, 2022, Morey entered the cadaver lab twice during Dr. Smith's instructional time. The first instance, Dr. Smith acknowledged his presence and asked him if he could help him with something. Morey responded, "I don't like black people."

100.    The second time Morey entered the cadaver lab, he told Dr. Smith that he was just checking to see if the cadavers were in and winked.

101.   Entering the cadaver lab requires the swiping of a Department of Natural Sciences lab access card. All swipes are recorded in Defendants' electronic database.

102.   According to Lazenby, Morey "never interrupted his class sessions or entered the lab while he was teaching."

103.   According to Mayhew, Morey "has not recently come into the room during any of his classes but did so a few years ago." Morey entered Mayhew's lab one time years ago.

104.   Only Dr. Smith's instructional time in the lab continues to be interrupted.

105.   On August 30, 2022, Dr. Smith sent an email to Manning informing her of the incident.

106.   Manning thanked Dr. Smith for informing her, adding, "I am very saddened to hear this news because we understood that the previous concerns and situation were resolved."

107.   The Department of Natural Sciences reviewed the swipe card cadaver lab access records and verified that Morey entered the cadaver lab twice that day within a few minutes of each other, during Dr. Smith's instructional time.

108.   On September 1, 2022, while Dr. Smith was in the hallway heading to the restroom, Morey passed by him and stated, "I hurt blacks." In response, Dr. Smith kept walking and went to the restroom.

109.   On September 2, 2022, Dr. Smith again informed Manning of the incident.

110.   Morey's actions towards Dr. Smith were turned over to Defendants' Equity, Civil Rights and Title IX Office ("ECRT") for investigation.

111.   As a part of the investigation, Dr. Smith provided Defendants with supportive documents from Fall 2019 through September 2022. ECRT reviewed the following, among other things:

   a.   University's Policy on Discrimination & Harassment, SPG 201.89-1;

14

    b. Text messages exchanged between Dr. Smith, Mayhew, and Lazenby, provided by Dr. Smith;

    c. Text messages exchanged between Dr. Smith and Karmen Etter, provided by Dr. Smith;

    d. Email message exchanged between Dr. Smith and Duncan regarding COVID protocols and photo Dr. Smith took of Morey teaching without a face mask, provided by Dr. Smith;

    e. Video of Dr. Smith and Morey interaction in the lab in December 2021, provided by Dr. Smith

    f. Email exchange between Fhaner and Manning and context provided by Fhaner; and

    g. Swipe card lab access records from August 30, 2022 and email correspondence between Manning and Morey about lab access, provided by Manning.

*ii.*     ***The Bachelor of Applied Science Program Director Position/Fhaner Precluded Dr. Smith from Applying for the Position***

112. On September 12, 2022, Fhaner sent an email to "UM-F Department of Natural Sciences". The email was to the entire natural sciences department.

113. In that email, Fhaner informed the entire department that he was "soliciting interest from anyone who may want to take on the role of BAS [Bachelor of Applied Science Program] Director.

114. Dr. Smith and a white male, Dennis Viele expressed interest in the position.

115. Thereafter, Fhaner informed Dr. Smith that he allegedly did not meet the requirements of the position. Specifically, Fhaner said that any candidate allegedly had to be at least a Leo Lecturer III. This information was not provided in the email seeking names of those that were interested in the position.

116. Dr. Smith requested the job description. He wanted to see what was required so that he could work on building those skill sets.

117. Fhaner refused to give him a job description; or any other documents regarding the position and/or its level.

118. Notably, a Leo Lecturer I can apply for any position within the University. There is no requirement that a position requires candidates of only a certain Leo Lecturer level. Dr. Smith was precluded from applying for the BAS Director position.

119. On September 21, 2022, Dr. Smith again treated with Dr. Gleesing who prescribed him Buspirone due to anxiety he suffered from the on-the-job treatment.

### iii.  *Switching of Dr. Smith's Class Schedule*

120. In October 2022, Fhaner switched Dr. Smith's teaching schedule with that of Lazenby. On October 18, 2022, Dr. Smith, once aware, contacted Fhaner and notified him that the change in schedule created a conflict for him. Lazenby informed Fhaner of the same. Dr. Smith requested to keep his schedule the same as it always was—Tuesday/Thursday (lab); Monday/Wednesday (Lazenby lecture).

121. Fhaner responded, "As stated, I made the switch. As stated, I was trying to be proactive to split up interaction between you and Jon [Morey], which is my prerogative as Chair in order to avoid faculty conflict."

122. Fhaner returned Dr. Smith's schedule to its original days and times.

### iv.  *Dr. Smith's Request to teach Lecture, as well as, Cadaver Lab*

123. On his Fall 2021 and Fall 2022 Bio 634 lab student course evaluations, students expressed their desire that Dr. Smith teach both the lab and lecture portions of the course.

124. Mayhew teaches the lecture; and Lazenby teaches lab.

125. Dr. Smith approached Fhaner and requested to be able to teach a portion of the lecture section that Mayhew teaches; so that he would be teaching both the lecture and lab like Morey and Mayhew.

126.   Fhaner denied Dr. Smith's request indicating that the Occupational Therapy department likes the schedule the way it is.

127.   In November 2022, Dr. Smith spoke with Mayhew and Gerry Conti ("Conti")—Clinical Associate Professor and Interim Director of Academic Programs, Occupational Therapy regarding his being scheduled to teach both the lecture and lab portions of Bio 634.

128.   Mayhew had no problem with Dr. Smith teaching a portion of the lectures that he is typically scheduled to teach; and Conti gave Dr. Smith the go ahead to do the same.

129.   On November 22, 2022, Dr. Smith again contacted Fhaner requesting that he be allowed to teach both the lecture and lab for the Bio 634 Occupational Therapy students.   Dr. Smith informed Fhaner that Conti "gave her blessings to teach the Bio 634 OT lecture" and that Mayhew was also "on board" with Dr. Smith teaching the OTs.

130.   Fhaner replied as follows, "While I absolutely applaud your initiative, at this time I am unable to justify splitting up the Bio 634 lecture.   That would double the cost of instruction with zero increase in tuition return.   I'm sorry Melvin."

131.   On December 1, 2022, Dr. Smith replied explaining that his teaching the Occupational Therapy 634 lab would save Defendants money.   Leo Lecturer I professors are paid less per course than Leo Lecturer II professors.   Dr. Smith as a Leo Lecturer I would be paid less than Mayhew as a Leo Lecturer II.   Dr. Smith ended the communication stating, "So I would be the most cost efficient option."

132.   Dr. Smith's request, if granted, would result in an increase in his salary.

133.    Fahner again denied Dr. Smith's request.

*v.*     ***Delayed Final Investigative Report***

134.    In December 2022, ECRT provided Dr. Smith with a Preliminary Investigative Report. He and Morey were asked to provide additional comments; and were granted until January 2, 2023, at 11:59 pm to provide their feedback.

135.    As of February 20, 2023, six months after the matter was referred to ECRT, Kaylie Kinney Straka—Senior Investigator & Deputy Title IX Coordinator stated, "You will get a copy of the final report as that is part of standard procedure. I don't know how long it will take to get the final review completed-my immediate supervisor completed her review last week and we sent it off for the final stage, but that can take a week or two depending on reviewer schedules."

136.    As of the filing of this matter, Dr. Smith has not received the Final Investigative Report.

*vi.*    ***EEOC Charge***

137.    On December 8, 2022, Dr. Smith filed his EEOC Charge against Defendants. Therein, he asserted claims of race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964.

138.    On December 9, 2022, Defendants were provided the Notice of Charge of Discrimination for Dr. Smith.

139.    On December 20, 2022, the EEOC made "no determination about whether further investigation would establish violations of the statute." And specifically indicated, "[t]his does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge."

140.   The EEOC also, in the same Determination and Notice of Rights, provided Dr. Smith with a Right to Sue.

<div align="center">

**Count I**
**Hostile Work Environment in Violation of**
**the Michigan Elliott-Larsen Civil Rights Act**

</div>

141.   Dr. Smith incorporates by reference paragraphs 1 through 140.

142.   At all material times, Dr. Smith was an employee, and Defendants were his employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

143.   Dr. Smith is an African-American man.

144.   From the beginning of his career as a Leo Lecturer I through Fall 2022, Dr. Smith has been subjected to both communications and conduct because of his race.

145.   Specifically, Morey, who has a propensity to discriminate against minorities, targeted Dr. Smith.   Whereby, Morey repeatedly entered the cadaver lab during Dr. Smith's instructional time; disrupted Dr. Smith's instructional time; interfered with Dr. Smith's students while they were taking exams, among other things; reported Dr. Smith for alleged safety violations leading to others telling him to follow the procedures, that violations would not be tolerated, and the lab supervisor entering the cadaver lab during his instructional time; questioned Dr. Smith's credentials in front of students, as well as, other Defendants' employees; told Dr. Smith that he doesn't like black people and that he hurts black people, among other things.

146.   Important, Defendants, failed to take prompt and appropriate remedial action in response to his many complaints regarding differential and racially targeted treatment from Morey; Fhaner's refusing to allow him to apply for a Director position; refusing to schedule him

<div align="center">19</div>

to teach both lecture and lab as his non-minority co-workers teach, as such, an increase in salary; giving him a partially meets expectations interim performance evaluation; changed Dr. Smith's (the non-offender's) teaching schedule in order to separate him from Morey; and having failed to timely respond to his race discrimination complaints.

147. The frequency; the physically threatening nature; the humiliation of having his instructional time interrupted; and having his credentials questioned in front of students and other Defendants' employees; that the conduct unreasonably interfered with Dr. Smith's performance in that he was forced to seek medical treatment; and again, his instructional time was disrupted support the subjectively and objectively severe and pervasiveness of the conduct Dr. Smith suffered.

148. Dr. Smith did not welcome any of the conduct described herein.

149. Dr. Smith's complaints about Morey targeting minorities, which he was one, and that Morey was targeting him; and Morey saying that he doesn't like black people and that he hurts black people; along with Dr. Smith's numerous other complaints about the conduct described herein, among other things, support that Defendants had actual and/or constructive notice of the race-based conduct that Dr. Smith suffered on-the-job.

150. Further, the forementioned conduct supports that Defendants knew and/or should have known that Dr. Smith was being subjected to a racially hostile work environment.

151. Defendants, by their agents, representatives, and employees, was predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

152. Defendants' actions were intentional, with reckless indifference to Dr. Smith's rights and sensibilities.

153.    As a direct and proximate result of said acts and omissions of Defendant's agents and employees, Dr. Smith has suffered and will continue to suffer lost wages, pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, severe nervousness, embarrassment and humiliation requiring professional medical treatment and medication all past, present, and future.

### Count II
### Race Discrimination in Violation of the
### the Michigan Elliott-Larsen Civil Rights Act

154.    Dr. Smith incorporates by reference paragraphs 1 through 153.

155.    At all material times, Dr. Smith was an employee, and Defendants were his employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

156.    Dr. Smith is an African-American man.

157.    During his employment with Defendants, Dr. Smith, as described herein, was treated differently than his white counterparts.  He was given a partially meets performance evaluation; was precluded from applying for a director position; was denied the opportunity to teach both lecture and lab classes, and as such an increase in salary; and was denied the opportunity to volunteer within the Department of Natural Sciences.  And, Dr. Smith's (the non-offender) schedule was changed in order to separate him from Morey.

158.    Notably, Dr. Smith was qualified to apply for the Director position; as well as to teach both lecture and lab as he does at Wayne County Community College District.

159.   Dr. Smith's white counterparts, Morey's, Lazenby's and Mayhew's credentials were not challenged; were not given partially meets performance evaluations; were not precluded from applying for a director position; were not denied the opportunity to teach both lecture and lab classes; were not denied the opportunity to volunteer within the Department of Natural Sciences; and did not have their class schedule changed in order to move them away from an offender co-worker; supporting that Dr. Smith was treated differently than his white counterparts.

160.   Defendants, by their agents, representatives, and employees, was predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

161.   Defendants' actions were intentional, with reckless indifference to Dr. Smith's rights and sensibilities.

162.   As a direct and proximate result of said acts and omissions of Defendant's agents and employees, Dr. Smith has suffered and will continue to suffer lost wages, pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, severe nervousness, embarrassment and humiliation requiring professional medical treatment and medication all past, present, and future.

**Count III**
**Retaliation in Violation of the**
**Michigan Elliott-Larsen Civil Rights Act**

163.   Dr. Smith incorporates by reference paragraphs 1-162 as if fully restated herein.

164.   At all material times, Dr. Smith was an employee and Defendants were his employer covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

165. Throughout his employment, Dr. Smith repeatedly complained about the disparity in treatment between him and his white counterparts.

166. Specifically, Dr. Smith complained about Morey targeting minorities, which he was one, and that Morey was targeting him; and Morey saying that he doesn't like black people and that he hurts black people; along with Dr. Smith's numerous other complaints about the conduct described herein; as well as the Notice of Charge of Discrimination provided to Defendants.

167. As described above, Defendants had actual and/or constructive notice of Dr. Smith's race discrimination complaints.

168. After making his varied complaints, Dr. Smith was subjected to adverse actions from Defendants. For example, Dr. Smith was given a partially meets performance evaluation; was precluded from applying for a director position; was denied the opportunity to teach both lecture and lab classes, and as such an increase in salary; and was denied the opportunity to volunteer within the Department of Natural Sciences. And, Dr. Smith's (the non-offender) schedule was changed in order to separate him from Morey.

169. Notably, Dr. Smith was qualified to apply for the Director position; as well as to teach both lecture and lab as he does at Wayne County Community College District.

170. In addition to the asserted conduct occurring close to when Dr. Smith made varied targeting and other race-based conduct complaints; Dr. Smith suffered all conduct as described herein after Defendants received actual or constructive notice of Dr. Smith's race discrimination complaints.

171. Defendants did not treat Dr. Smith's counterparts, who did not make targeting and other race-based complaints, in the same manner.

172.   Defendants', through its agents, representatives, and employees, actions constitute retaliation.

173.   As a direct and proximate result of said acts and omissions of Defendant's agents and employees, Dr. Smith has suffered and will continue to suffer lost wages, pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, severe nervousness, embarrassment and humiliation requiring professional medical treatment and medication all past, present, and future.

## Count IV
### Hostile Work Environment in Violation
### of Title VII of the Civil Rights Act of 1964

174.   Dr. Smith incorporates by reference paragraphs 1 through 172.

175.   At all material times, Dr. Smith was an employee, and Defendants were his employer, covered by and within the meaning of the Title VII of the Civil Rights Act of 1964, 28 USC 42, USC. §2000e-16.

176.   Dr. Smith is an African-American man.

177.   From the beginning of his career as a Leo Lecturer I through Fall 2022, Dr. Smith has been subjected to both communications and conduct because of his race.

178.   In addition, Morey, who has a propensity to discriminate against minorities, targeted Dr. Smith.   Whereby, Morey repeatedly entered the cadaver lab during Dr. Smith's instructional time; interrupted Dr. Smith's instructional time; interfered with Dr. Smith's students while they were taking exams, among other things; reported Dr. Smith for alleged safety violations leading to others telling him to follow the procedures, that violations would not be tolerated, and the lab supervisor entering the cadaver lab during

his instructional time; questioned Dr. Smith's credentials in front of students, as well as, other Defendants' employees; told Dr. Smith that he doesn't like black people and that he hurts black people, among other things.

179. Important, Defendants, failed to take prompt and appropriate remedial action in response to his many complaints regarding differential and racially targeted treatment from Morey; refusing to allow him to apply for a Director position; refusing to schedule him to teach both lecture and lab as his non-minority co-worker taught; giving him a partially meets expectations interim performance evaluation; and having failed to timely respond to his race discrimination complaints.

180. In addition, Fahner prevented Dr. Smith from applying for a Director position; gave Dr. Smith a partially meets expectations interim performance evaluation; denied Dr. Smith's request to teach lecture and lab, and as such, an increase in salary; changed Dr. Smith's (the non-offender's) teaching schedule in order to separate him from Morey;

181. The frequency; the physically threatening nature; the humiliation of having his instructional time interrupted; and having his credentials questioned in front of students and other Defendants' employees; and that the conduct unreasonably interfered with Dr. Smith's performance in that he was forced to seek medical treatment; and again, his instructional time being disrupted support the subjectively and objectively severe and pervasiveness of the conduct Dr. Smith suffered.

182. Dr. Smith did not welcome any of the conduct described herein.

183. Dr. Smith's complaints about Morey targeting minorities, which he was one, and that Morey was targeting him; and Morey saying that he doesn't like black people and that he hurts black people; along with Dr. Smith's numerous other complaints about the conduct

described herein support that Defendants had actual and/or constructive notice of the race-based conduct that Dr. Smith suffered on-the-job.

184. Further, the forementioned conduct supports that Defendants knew and/or should have known that Dr. Smith was being subjected to a racially hostile work environment.

185. Defendants, by their agents, representatives, and employees, was predisposed to discriminate on the basis of race and acted in accordance with that predisposition.

186. Defendants' actions were intentional, with reckless indifference to Dr. Smith's rights and sensibilities.

187. As a direct and proximate result of said acts and omissions of Defendant's agents and employees, Dr. Smith has suffered and will continue to suffer lost wages, pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, severe nervousness, embarrassment and humiliation requiring professional medical treatment and medication all past, present, and future.

## Count V
### Race Discrimination in Violation
### of Title VII of the Civil Rights Act of 1964

188. Dr. Smith incorporates by reference paragraphs 1 through 187.

189. At all material times, Dr. Smith was an employee, and Defendants were his employer, covered by and within the meaning of the Title VII of the Civil Rights Act of 1964, 28 USC 42, USC. §2000e-16.

190. Dr. Smith is an African-American man.

191. During his employment with Defendants, Dr. Smith, as described herein, was treated differently than his white counterparts. His credentials were challenged; he was given a

partially meets performance evaluation; was precluded from applying for a director position; was denied the opportunity to teach both lecture and lab classes, and as such an increase in salary; and was denied the opportunity to volunteer within the Department of Natural Sciences. And, Dr. Smith's (the non-offender) schedule was changed in order to separate him from Morey.

192.   Notably, Dr. Smith was qualified to apply for the Director position; as well as to teach both lecture and lab as he does at Wayne County Community College District.

193.   Dr. Smith's counterparts, Morey, Lazenby and Mayhew did not have their credentials challenged; were not given partially meets performance evaluations; were not precluded from applying for a director position; were not denied the opportunity to teach both lecture and lab classes; and did not have their class schedule changed in order to move them away from an offender co-worker; supporting that Dr. Smith was treated differently than his white counterparts.

194.   As a direct and proximate result of said acts and omissions of Defendant's agents and employees, Dr. Smith has suffered and will continue to suffer lost wages, pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, severe nervousness, embarrassment and humiliation requiring professional medical treatment and medication all past, present, and future.

<div align="center">

**Count VI**
**Retaliation in Violation**
**of Title VII of the Civil Rights Act of 1964**

</div>

195.   Dr. Smith incorporates by reference paragraphs 1 through 194.

196.    At all material times, Dr. Smith was an employee, and Defendants were his employer, covered by and within the meaning of the Title VII of the Civil Rights Act of 1964, 28 USC 42, USC. §2000e-16.

197.    Throughout his employment, Dr. Smith repeatedly complained about the disparity in treatment between him and his white counterparts.

198.    Specifically, Dr. Smith complained about Morey targeting minorities, which he was one, and that Morey was targeting him; and Morey saying that he doesn't like black people and that he hurts black people; along with Dr. Smith's numerous other complaints about the conduct described herein; as well as the Notice of Charge of Discrimination provided to Defendants.

199.    As described above, Defendants had actual and/or constructive notice of Dr. Smith's race discrimination complaints.

200.    After making his varied complaints, Dr. Smith was subjected to adverse actions from Defendants. For example, Dr. Smith was given a partially meets performance evaluation; was precluded from applying for a director position; and was denied the opportunity to teach both lecture and lab classes, as such an increase in salary; and was denied the opportunity to volunteer within the Department of Natural Sciences. And, Dr. Smith's (the non-offender) schedule was changed in order to separate him from Morey.

201.    Notably, Dr. Smith was qualified to apply for the Director position; as well as to teach both lecture and lab as he does at Wayne County Community College District.

202.    In addition to the asserted conduct occurring close to when Dr. Smith made varied targeting and other race-based conduct complaints; Dr. Smith suffered all conduct as

described herein after Defendants received actual and/or constructive notice of Dr. Smith's complaints.

203. Defendants did not treat Dr. Smith's counterparts, who did not make targeting and other race-based complaints, in the same manner.

204. Defendants', through its agents, representatives, and employees, actions constitute retaliation.

205. As a direct and proximate result of said acts and omissions of Defendant's agents and employees, Dr. Smith has suffered and will continue to suffer lost wages, pension benefits, loss of earning capacity, loss of dignity and enjoyment of life, extreme mental and emotional distress, pain and suffering, severe nervousness, embarrassment and humiliation requiring professional medical treatment and medication all past, present, and future.

WHEREFORE, Dr. Smith Requests that this Court enter judgment against Defendants as follows:

1. Legal relief

   a. a judgment for lost wages in whatever amount he is found to be entitled;

   b. compensatory damages in whatever amount he is found to be entitled;

   c. emotional distress damages in whatever amount he is found to be entitled;

   d. punitive and exemplary damages commensurate with the wrong and Defendants' ability to pay;

   e. an award of interest, cost, and reasonable attorney fees.

2. Equitable relief

   a. An injunction prohibiting Defendant from exercising its policy and custom of discriminating as described herein;

b.   An award of interest, costs, and reasonable attorney fees;

c.   Whatever other equitable relief appears appropriate at the time of trial.

Respectfully submitted,

I.A.B. Attorneys At Law, PLLC

By:   *Felicia Duncan Brock*
      Felicia Duncan Brock (P63352)
      8829 Asbury Park
      Detroit, Michigan 48228
      (313) 318-3180
      duncan@iabattorneys.com

Dated:  March 16, 2023

## JURY DEMAND

Plaintiff demands a jury trial

I.A.B. Attorneys At Law, PLLC

By:   *Felicia Duncan Brock*
      Felicia Duncan Brock (P63352)
      8829 Asbury Park
      Detroit, Michigan 48228
      (313) 318-3180
      duncan@iabattorneys.com

Dated:  March 16, 2023

# EXHIBIT B



# MiCOURT Case Search

LOGIN

Viewing cases for court **7th Circuit Court**Select Another CourtBack to Search Results Print
Case Details

Additional Resources
**Case ID**
2023-0000118665-CD
**Court Location**
7th Circuit Court - Genesee
**Case Entitlement**
SMITH V REGENTS
**Judge of Record**
CHRISTENSON,B. CHRIS,
**Date Filed**
03/16/2023
**Case Status**
OPEN
**Closed Date**
**Balance**
Parties (2)

Hide
**Party Name**
SMITH,DR.MELVIN,
**Party Type/Number**
PLAINTIFF - 1
**Attorney Name**
FELICIA DUNCAN BROCK
**Alternate Name(s)**
**Answer Date**

**Service Date**
**Disposition**
**Disposition Date**
**Party Name**
REGENTS OF UNIVERSITY OF MI FLINT,,
**Party Type/Number**
DEFENDANT - 1
**Attorney Name**
**Alternate Name(s)**
**Answer Date**
**Service Date**
**Disposition**
**Disposition Date**
Bonds (0)

Show
Hearings (0)

Show
Financial Orders (0)

Show
Events (3)

Hide

○   ○

**Event Date**
03/16/2023
**Description**
JURY DEMAND FILED
**Party/Count**
P1
**Event No./Clerk**
1 - SR
**Judge**
CHRISTENSON,B. CHRIS,

**Description**
SUMMONS AND COMPLAINT
**Party/Count**
D1
**Event No./Clerk**
2 - SR

**Description**
COMPLAINT
**Party/Count**
**Event No./Clerk**
3 - SR
**Comment**

COMPLAINT FILED
ONE COURT OF JUSTICE | INDEPENDENCE • ACCESSIBILITY • ENGAGEMENT •
EFFICIENCY

# EXHIBIT C

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT**
**FOR THE COUNTY OF GENESEE**

**DR. MELVIN SMITH,**

            Plaintiff,                          Case No. 23-118665-CD

v.                                     Hon. B. Chris Christenson

**REGENTS OF THE**
**UNIVERSITY OF MICHIGAN - FLINT**;

            Defendants.

_____/

| | |
|---|---|
| **I.A.B. ATTORNEYS AT LAW, PLLC .** | **BUTZEL LONG** |
| By :  **Felicia Duncan Brock (P63352)** | By:  **Daniel B. Tukel (P34978)** |
| 8829 Asbury Park | 201 West Big Beaver Road |
| Detroit, Michigan  48228 | Suite 1200 |
| (313) 318-3180 | Troy, Michigan  48084 |
| **Attorneys for Plaintiff** | (248) 258-1616 |
| | **Attorneys for Defendants** |
| **SMITHWEBSTER LAW OFFICES, PLLC** | |
| By:  **Tracy G. Smith (P74572)** | |
| 28488 Woodward Avenue, #427 | |
| Royal Oak, Michigan  48073 | |
| (313) 949-5414 | |
| **Attorneys for Plaintiff** | |

_____/

**NOTICE TO STATE COURT OF FILING**
**NOTICE OF REMOVAL WITH FEDERAL COURT**

TO:    Clerk, Genesee County Circuit Court

       Felicia Duncan Brock
       8829 Asbury Park
       Detroit, Michigan  48228

       PLEASE TAKE NOTICE that on April 18, 2023, defendant University of Michigan

moved this action to the United States District Court for the Eastern District of Michigan

pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, where it is now pending as case 23-cv-10872.

A copy of the Notice of Removal, which has been filed with the United States District Court, is

attached.

**BUTZEL LONG**

By: */s/ Daniel B. Tukel*
Daniel B. Tukel
201 West Big Beaver Road
Suite 1200
Troy, Michigan  48084
(248) 258-1616
tukel@butzel.com
(P34978)

DATED:        April 17, 2023

**<u>Certificate of Service</u>**

I hereby certify that on April 17, 2023, I electronically filed the foregoing document, Notice to State Court of Filing of Notice of Removal to Federal Court, with the Clerk of the Court using the ECF system, which will send notification of such filing and service of said documents to all parties registered with ECF, through their counsel of record.

<div style="margin-left:40%">

s/ Daniel B. Tukel
201 West Big Beaver Road
Suite 1200
Troy, Michigan  48084
(248) 258-1616
tukel@butzel.com
(P34978)

</div>